**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| JAVIER GASCA,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF MONTEREY, et al.,<br><br>    Defendants. | Case No. 16-cv-04221-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT CFMG'S MOTION FOR SUMMARY JUDGMENT**<br><br>[Re: ECF 73] |

Plaintiff Javier Gasca ("Gasca"), a disabled individual who uses a wheelchair, claims that he was discriminated against and denied adequate medical care while incarcerated at the Monterey County Jail ("Jail") between January 29, 2016 and August 22, 2016. He sues the County of Monterey ("County"); the Monterey County Sheriff's Office ("MCSO"), which operates the Jail; and California Forensic Medical Group ("CFMG"), a private corporation hired by the County to provide medical services at the Jail.

The Court heard CFMG's motion for summary judgment on May 9, 2019. The motion is GRANTED IN PART AND DENIED IN PART for the reasons discussed below.

**I.    BACKGROUND**

The following facts are limited to those relevant to the claims against CFMG, and they are undisputed unless otherwise noted. Gasca was born with a condition called Arthrogryposis Multiplex Congenita, which causes contractures and deformities of the joints in the arms and legs. Chiang Decl. ¶ 5, ECF 74; Jail Intake Assessment, Exh. A to Bertling Decl. at 000001-000008,

ECF 73-3. He has been wheelchair dependent since childhood. Chiang Decl. ¶ 5; Salinas Valley Memorial Hospital Records, Exh. B to Bertling Decl. at 0033-0043, ECF 73-4. Because he spends the majority of his waking hours in a wheelchair, he is susceptible to getting pressure ulcers. Garcia Dep. 30:15-24, Exh. A to Feldman Decl., ECF 76-1.

Gasca was booked into the Jail on January 29, 2016. Chiang Decl. ¶ 20; Jail Intake Assessment, Exh. A to Bertling Decl. at 000001-000008, ECF 73-3. He came in with his own wheelchair. *Id*. At intake, he indicated that he had an abscess on his back, but when he had a medical examination on February 1, 2016, he did not have any active abscesses or sores. Chiang Decl. ¶ 20; Jail Intake Assessment, Exh. A to Bertling Decl. at 000002, ECF 73-3; CFMG Records, Exh. A to Bertling Decl. at 0142, ECF 73-3. Gasca began complaining of tenderness and abscesses on his buttocks in late February. Chiang Decl. ¶ 21; CFMG Records, Exh. A to Bertling Decl. at 0219, ECF 73-3. Examination showed induration under the site of an old abscess on the right buttock.[1] Chiang Decl. ¶ 21; CFMG Records, Exh. A to Bertling Decl. at 0142, ECF 73-3. Gasca was treated with oral and topical antibiotics and warm compresses, and when he was re-checked three days later, the tenderness and induration had improved. *Id*.

On March 23, 2016, Gasca complained of an open pressure wound. Chiang Decl. ¶ 23; CFMG Records, Exh. A to Bertling Decl. at 0141, ECF 73-3. He was treated with oral antibiotics and daily dressing changes. *Id*. His family immediately replaced his wheelchair, and a second mattress was prescribed to reduce pressure. Chiang Decl. ¶ 23; CFMG Records, Exh. A to Bertling Decl. at 0140, ECF 73-3. When he was checked on April 7, 2016, the wound was covered with a small Tegaderm dressing and there was no sign of infection. Chiang Decl. ¶ 24; CFMG Records, Exh. A to Bertling Decl. at 0140, ECF 73-3. However, in mid-April, a new area of redness had appeared on his buttock. Chiang Decl. ¶ 24; CFMG Records, Exh. A to Bertling Decl. at 0135, ECF 73-3. When there was no improvement by April 19, 2016, an inflatable donut was ordered to relieve pressure. *Id*. Gasca ultimately suffered three pressure wounds. Chiang

---

[1] Induration is defined as either "an increase in the fibrous elements in tissue commonly associated with inflammation and marked by loss of elasticity and pliability," or "a hardened mass or formation." *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary (last accessed May 15, 2019).

Decl. ¶ 26; CFMG Records, Exh. A to Bertling Decl. at 0130, ECF 73-3. Two small pustules had to be drained, but by early June 2016 the wounds had resolved to only three small pinhole-sized lesions with no infection. *Id*.

On June 5, 2016, Gasca submitted a grievance complaining that he had developed numerous abscesses that were not healing because they were not being treated properly at the jail infirmary. Grievance, Exh. A to Bertling Decl. p. 000090, ECF 73-3. The grievance requested treatment at the hospital, and stated that "if you guys cannot ecomidate [sic] to ones medical needs or treatment by law you guys need to release me from custody." *Id*. Lola Bayer, R.N., was CFMG's Director of Nurses and responsible for responding to grievances about medical issues. Bayer Dep. 23:19-25, Exh. 3 to Feldman Decl., ECF 76-1. On the bottom half of the grievance form, in the space reserved for "Findings/Recommendations," Nurse Bayer noted that she had responded to Gasca in person on June 10, 2016. Grievance, Exh. A to Bertling Decl. p. 000090, ECF 73-3. The grievance form indicates that Nurse Bayer spoke to Gasca at 6:50 a.m. *Id*. However, Gasca claims that Nurse Bayer went to his housing pod at 3:00 a.m., had a deputy wake him and bring him out, and yelled at him for submitting the grievance. Gasca Dep. 81:19-82:13. Gasca testified that Nurse Bayer told him not to submit any more grievances. *Id*. When questioned about the incident at her deposition, Nurse Bayer stated that she did not reprimand Gasca during the interaction but rather "educated" him. Bayer Dep. 36:10-22, Exh. 3 to Feldman Decl., ECF 76-1.

On June 10, 2016, Gasca submitted a written request to CFMG for a "pink cup," which is a small pitcher to hold water. Request (attached to Garcia Dep.), Exh. 1 to Feldman Decl., ECF 76-1; Gasca Dep. 62:16-63:9, Exh. 2 to Feldman Decl., ECF 76-1. Gasca requested the pink cup because he could not reach the sinks in the Jail to get a drink of water on his own. *Id*. The request was denied with the following notation: "Sir, we do not give pitchers out for chronic use. Request denied. Medical Staff." Request (attached to Garcia Dep.), Exh. 1 to Feldman Decl., ECF 76-1.

Gasca did not complain about any pressure sores between early June 2016 and his release from Jail on August 22, 2016. Chiang Decl. ¶ 26; CFMG Records, Exh. A to Bertling Decl. at

3

1  0218-0219, ECF 73-3.  CFMG's medical records indicate that Gasca's pressure sores continued to
2  improve and remained stable.  *Id.*  However, on the day he was released, Gasca went to the Salinas
3  Valley Memorial Hospital Emergency Department, complaining that he had a pressure sore which
4  had not been treated in the Jail.  ED Records, Exh. B to Bertling Decl. pp. 181-83, ECF 73-4.  The
5  treatment notes state, "On my examination I did not appreciate any masses or tenderness or
6  redness in his buttock region."  *Id.*  A CT was ordered, but staff could not get an IV started and
7  Gasca declined to wait.  *Id.*  No antibiotic or other medication was prescribed.  *Id.*  A few days
8  later, on August 25, 2016, Gasca went to the San Gorgonio Memorial Hospital Emergency
9  Department.  ED Records, Exh. C to Bertling Decl. pp. 8-19, ECF 73-5.  There is no narrative
10 description of an examination of Gasca in those records, which indicate that he was treated for an
11 abscess and discharged with an antibiotic.  *Id.*  Gasca followed up with his physician on
12 September 9, 2016, at which time no open sores or abscesses were observed.  Physician Records,
13 Exh. D to Bertling Decl. p. 35, ECF 73-6.

Gasca filed this action on July 26, 2016, while he was still incarcerated at the Jail, and he filed the operative first amended complaint ("FAC") on January 9, 2017.  Compl., ECF 1; FAC, ECF 37.  The FAC asserts claims under:  (1) Title II of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; (2) Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a); (3) California's Unruh Civil Rights Act, Cal. Civ. Code § 51; (4) the Eighth Amendment to the United States Constitution; (5) California negligence law; and (6) the CDPA, Cal. Civ. Code § 54.1.

CFMG is named as a defendant in Claim 3 for violation of California's Unruh Civil Rights Act and Claim 5 for medical malpractice.  CFMG seeks summary judgment or, in the alternative, partial summary judgment as to those claims.

**II.     LEGAL STANDARD**

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  "The moving party initially bears the burden of proving the absence of a genuine issue of material fact."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex*

4

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049. However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

CFMG contends that it is entitled to summary judgment with respect to Gasca's claims for discrimination in violation of the Unruh Civil Rights Act (Claim 3) and medical malpractice (Claim 5). The Court addresses those claims in reverse order.

### A. Medical Malpractice (Claim 5)

Claim 5, titled "Negligent Causation of Personal Injury," alleges that CFMG had a duty to provide "nondiscriminatory, safe and adequate access to the medical services it provided to Javier Gasca as a disabled inmate." FAC ¶ 53. The claim goes on to allege that "CFMG negligently violated that duty by failing to provide nondiscriminatory, safe and adequate access to its medical services to Plaintiff." FAC ¶ 54. Finally, the claim asserts that as a result of CFMG's negligence, "Javier Gasca has sustained pain, suffering, emotional distress and general damages in an amount to be ascertained according to proof at trial." FAC ¶ 55.

Despite the use of the term "nondiscriminatory" and the reference to Gasca's disability, it appears that Claim 5 is simply a common law medical malpractice claim. "In any medical malpractice action, the plaintiff must establish: (1) the duty of the professional to use such skill, prudence, and diligence as other members of his profession commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence." *Borrayo v. Avery*, 2 Cal. App. 5th 304, 310 (2016) (internal quotation marks, citations, and

alterations omitted).

"The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony, unless the conduct required by the particular circumstances is within the common knowledge of the layman." *Flowers v. Torrance Mem'l Hosp. Med. Ctr.*, 8 Cal. 4th 992, 1001 (1994) (internal quotation marks, citation, and alteration omitted). The "classic example" of a situation in which the common knowledge exception would apply "is the X-ray revealing a scalpel left in the patient's body following surgery." *Id*. Where the exception does not apply, "expert evidence is conclusive and cannot be disregarded." *Id*. (internal quotation marks and citation omitted).

CFMG submits the declaration and report of its retained medical expert, C. Hsien Chiang, M.D. Chiang Decl., ECF 74. Dr. Chiang clearly is qualified to provide expert opinions in this case. He has been a licensed physician and surgeon in California since 2001, he was employed as a staff physician in the Orange County jail system from 2006 through 2011, and he was promoted to the position of Medical Director for the Orange County Jail in 2011. Chiang Decl. ¶¶ 1-2. Prior to rendering his opinions, Dr. Chiang reviewed Gasca's medical records from the Jail, the two emergency department visits discussed above, and Gasca's physician. Chiang Decl. ¶ 4. He also reviewed Gasca's deposition, Nurse Bayer's deposition, and the deposition of CFMG physician Eliud Garcia, M.D. *Id*. After summarizing that records review, Dr. Chang concluded that "CFMG and its staff provided care and treatment to Mr. Gasca that met or exceeded the standard of care." Chiang Decl. ¶ 35. He also concluded that, "to a degree of reasonable medical probability, CFMG did not cause or contribute to any injuries related to Mr. Gasca's pressure sores." *Id*.

Dr. Chiang's expert opinions are sufficient to meet CFMG's initial burden of proof on summary judgment, since those opinions negate elements (2) and (4) of Gasca's medical malpractice claim. The burden thus shifts to Gasca to demonstrate the existence of genuine issues for trial. In order to meet that burden, Gasca must present expert opinion evidence, because appropriate treatment for chronic pressure sores is not within the common knowledge of a lay

6

person (and Gasca does not contend that it is). Gasca has not designated a medical expert in this case, and he has not submitted expert opinion evidence to counter Dr. Chiang.

Gasca attempts to establish the existence of material issues for trial by citing the testimony of Dr. Eliud Garcia, a CFMG physician who provides medical services to Jail inmates and who treated Gasca. As an initial matter, Dr. Garcia was not designated as an expert in this case. Accordingly, it is unclear whether his testimony could satisfy Gasca's burden of proof on summary judgment even if it supported Gasca's position. Moreover, Dr. Garcia's testimony does not suggest that CFMG's treatment of Gasca fell below the standard of care.

Gasca points to Dr. Garcia's testimony that the pressure wounds "could have been" caused by shear force. Garcia Dep. 51:6-9, Exh.1 to Feldman Decl., ECF 76-1. Dr. Garcia also testified, "I know that there are air and gel mattresses," and "I believe I've used egg crate mattresses for people before." Garcia Dep. 40:15-41:18. Dr. Garcia did not prescribe a specialized mattress for Gasca – he prescribed a second standard mattress. Garcia Dep. 40:3-13. Gasca asserts that Dr. Garcia's testimony creates "a triable issue of fact whether defendant breached the standard of care . . . by failing to order a specialized mattress such as an egg create, gel or foam mattress in April 2016." Opp. at 5, ECF 76. However, nothing in Dr. Garcia's testimony suggests that a specialized mattress is the standard of care, or that ordering a second standard mattress fell beneath the standard of care. Similarly, nothing in Dr. Garcia's testimony supports Gasca's contention that failing to order the second mattress earlier fell below the standard of care.

Gasca also points to Dr. Garcia's testimony that iodine was used on one occasion to clean Gasca's wounds. Garcia Dep. 59:9-18, Exh. 1 to Feldman Decl., ECF 76-1. Dr. Garcia then was asked, "Do you have an understanding that iodine can kill healthy tissue or damage healthy tissue?" *Id*. Dr. Garcia responded, "It can be toxic to – yeah, new – new epithelial tissue. It's also a good antiseptic, so sometimes, you know . . . ." *Id*. Gasca argues that this testimony creates "a triable issue of fact whether the use of iodine exacerbated or delayed healing of plaintiff's wounds." Opp. at 5, ECF 76. Dr. Garcia did not testify that the use of iodine on one occasion exacerbated Gasca's wounds or delayed their healing. In fact, he stated that iodine is a good antiseptic. The next portion of the deposition transcript, not provided by Gasca, shows that Dr.

Garcia went on to testify that "you would want to weigh the benefit/risk ratio of it all. I mean, sometimes you might use the antiseptic quality of an iodine preparation and rinse it. It has less cidal effect on new tissue than hydrogen peroxide." Garcia Dep. 60:4-8, Exh F to Bertling Reply Decl., ECF 77-1. Nothing in this testimony suggests that use of iodine on Gasca's wounds was below the standard of care.

Gasca therefore has failed to meet his burden to present evidence sufficient to create a genuine issue for trial with respect to his medical malpractice claim. CFMG's motion for summary judgment is GRANTED as to Claim 5.

### B. Unruh Civil Rights Act (Claim 3)

Claim 3 asserts that CFMG violated California's Unruh Civil Rights Act, which entitles all persons to "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b). "To prevail on a disability discrimination claim under the Unruh Civil Rights Act, a plaintiff must establish that (1) she was denied the full and equal accommodations, advantages, facilities, privileges, or services in a business establishment; (2) her disability was a motivating factor for this denial; (3) defendants denied plaintiff the full and equal accommodations, advantages, facilities, privileges, or services; and (4) defendants' wrongful conduct caused plaintiff to suffer injury, damage, loss or harm." *Wilkins-Jones v. Cty. of Alameda*, 859 F. Supp. 2d 1039, 1048 (N.D. Cal. 2012) (internal quotation marks, citation, and alterations omitted). CFMG qualifies as a "business establishment" under the statute. *See id.* at 1050 (holding that private corporation hired by county to provide medical care to jail inmates was a business establishment under Unruh Act).

The FAC alleges an Unruh Act violation in only the most general terms, asserting that CFMG denied Gasca "the full and equal accommodations, advantages, facilities, privileges or medical services offered by CFMG." FAC ¶ 40, ECF 37. In its summary judgment motion, CFMG proceeds on the assumption that Gasca is asserting an Unruh Act violation based on the failure to provide him with appropriate care for his pressure ulcers. Motion at 16, ECF 73-1. In his opposition, however, Gasca clarifies that his Unruh Act claim is based on (a) the denial of his request for a "pink cup," and (b) Nurse Bayer's conduct in addressing his grievance. *See* Opp. at

7-9, ECF 76.

### 1. Pink Cup/Water Pitcher

Turning first to the claim based on the pink cup, the Court understands Gasca to be arguing that he was entitled to the same access to drinking water in the Jail as other, non-disabled inmates; the sinks and drinking fountains at the jail were not wheelchair accessible; and he was denied a water pitcher which would have been a reasonable accommodation allowing him access to drinking water. Missing from this argument is any evidence that CFMG bore responsibility for accessibility to drinking water in the main Jail. The record shows that Gasca's request for a pink cup was made and denied in June 2016, when he was housed in a regular jail unit. CFMG Progress Notes, Exh. A to Bertling Decl. at 000126, ECF 73-3. In July 2016, Gasca was moved to the Outpatient Housing Unit, which the Court understands to be part of or related to the infirmary. *Id*. At that time, he was provided with a water pitcher by CFMG staff. *Id*.

The record is clear that the barrier identified by Gasca was a fixture of the Jail facility maintained by Monterey County. Gasca cites no evidence to support his contention that CFMG was the proper party to provide a reasonable accommodation for barriers in the Jail. At the hearing, Gasca's counsel argued that water is a medical need, and that CFMG can be held liable under the Unruh Act for failing to provide a water pitcher in the main Jail. Absent evidence or authority to support the position that this was CFMG's responsibility, it appears that Gasca has sued the wrong party. The motion for summary judgment is GRANTED as to Claim 3 to the extent the claim is based on the denial of a water pitcher.

### 2. Nurse Bayer's Conduct

With respect to the Unruh Act claim based on Nurse Bayer's conduct, CFMG argues that there is insufficient evidence to show that Nurse Bayer yelled at Gasca and directed him not to file future grievances because the only evidence of such conduct is Gasca's "self-serving" declaration. *See* Reply at 8, ECF 77. CFMG relies on *Burchett v. Bromps*, 466 F. App'x 605 (9th Cir. 2012), holding that "a conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact" at the summary judgment stage. *Burchett* is factually distinguishable from the present case. Burchett sued his parole officer,

Bromps, for violation of the First Amendment based on Bromps' alleged statement that Burchett could not attend a Seventh Day Adventist church while on parole. *Burchett*, 466 F. App'x at 606. The Ninth Circuit affirmed the district court's grant of summary judgment to Bromps, holding that Burchett's "single statement in a deposition" regarding Bromps' alleged oral condition was insufficient to create a triable issue of fact absent "some detailed facts or other evidence to support his conclusory claim." *Burchett*, 466 F. App'x at 607. In the present case, Gasca's testimony regarding Nurse Bayer's conduct went beyond a single statement, and he provided details regarding the circumstances of the conversation and what was said. Gasca Dep. 81:19-82:13, Exh. 2 to Feldman Decl., ECF 76-1. Nurse Bayer does not deny that she spoke to Gasca about his grievance, although she disputes several details of Gasca's account. Bayer Dep. 36:10-22, Exh. 3 to Feldman Decl., ECF 76-1. Thus, Gasca's claim does not turn on a stray, unsupported statement but rather on how a trier of fact resolves the "he said – she said" versions of events presented by the conflicting testimony of Gasca and Nurse Bayer.

CFMG argues that even if Nurse Bayer yelled at Gasca, there is no evidence in the record showing that such yelling constituted intentional discrimination based on Gasca's disability. The law is settled intentional discrimination need *not* be shown when the plaintiff asserts claims under both the Americans with Disabilities Act ("ADA") and the Unruh Act, and the Unruh Act claim is based on the ADA claim. *See Wilkins-Jones*, 859 F. Supp. 2d at 1051 ("[T]o the extent Plaintiff seeks to raise her Unruh Act claim through an ADA violation, she need not plead intentional discrimination."); *Munson v. Del Taco, Inc.*, 46 Cal. 4th 661, 665 (2009) ("A plaintiff who establishes a violation of the ADA, therefore, need not prove intentional discrimination in order to obtain damages under section 52."). This is because the Unruh Act expressly provides that "[a] violation of the right of any individual under the federal Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section." Cal. Civ. Code § 51(f).

Where no ADA claim is asserted, however, it is unclear whether intentional discrimination must be shown. Some courts in this district have held that, "To the extent Plaintiff seeks to make an Unruh Act claim separate from an ADA claim, she must allege intentional discrimination." *Wilkins-Jones*, 859 F. Supp. 2d at 1051; *see also Earll v. eBay, Inc.*, No. 5:11-CV-00262-JF HRL,

2011 WL 3955485, at *3 (N.D. Cal. Sept. 7, 2011) ("A violation of the Unruh Act may be maintained independent of an ADA claim where a plaintiff pleads intentional discrimination in public accommodations in violation of the terms of the Act." (internal quotation marks and citation omitted)). CFMG relies on these cases in asserting that, because Gasca has not alleged an ADA claim against CFMG, Gasca must present evidence of intentional discrimination in order to defeat CFMG's summary judgment motion. Gasca cites *Wilson v. Murillo*, 163 Cal. App. 4th 1124 (2008), in support of his position that intentional discrimination is not required for an Unruh Act claim which is based on conduct which would constitute a violation of the ADA, even where no ADA claim is alleged. *Wilson* does not expressly address whether an Unruh Act claim requires a showing of intentional discrimination absent an ADA claim. However, the California Court of Appeal held that "violations under the ADA are expressly incorporated into the Unruh Act" and may form the basis of an Unruh Act claim even where no ADA claim is pled. *Wilson*, 163 Cal. App. 4th at 1132. Specifically, the Court of Appeal found proper an Unruh Act claim based on ADA provisions prohibiting retaliation and intimidation/coercion, even though the Unruh Act itself does not contain similar provisions. *Id*. at 1132-33.

The Court need not resolve the issue here, because even assuming that Gasca must establish intentional discrimination to prevail on his Unruh Act claim, he has presented evidence giving rise to a reasonable inference that the requirement is met. Gasca's evidence shows the following: he submitted a grievance stating that he was not receiving medical care for his abscesses (Grievance, Exh. A to Bertling Decl. p. 000090, ECF 73-3); the abscesses result from his disability, that is, from the necessity of spending so many hours in a wheelchair (Garcia Dep. 30:15-24, Exh. 1 to Feldman Decl., ECF 76-1); Nurse Bayer had Gasca woken at 3:00 a.m., yelled at him for submitting the grievance, and told him not submit any more grievances (Gasca Dep. 81:19-82:13); and Gasca did not submit any more grievances (Bayer Dep. 27:13-25, Exh. 3 to Feldman Decl., ECF 76-1). A jury could find that Nurse Bayer intentionally discriminated against Gasca for attempting to get appropriate medical care for his disability, and tried to intimidate him into refraining from exercising his rights to seek such care in the future. Nurse Bayer was the person CFMG designated to respond to grievances regarding medical care. Bayer Dep. 23:21-25.

CFMG argues that, at most, Gasca's evidence shows that Nurse Bayer's conduct was motivated by Gasca's submission of a grievance. Counsel argued at the hearing that just because the grievance was regarding treatment for sores that Gasca suffered as a result of his disability, yelling about the grievance does not equate to yelling about the disability. The Court declines to draw that distinction as a matter of law where, as here, Gasca's abscesses are so closely related to his disability. The Court concludes that whether Nurse Bayer had a discriminatory motive is a question for the jury, assuming that the Court ultimately agrees with CFMG's position that intentional discrimination is required. The precise contours of the Unruh Act claim, and whether intentional discrimination is required absent an ADA claim, are issues that will be resolved in the context of jury instructions should this case go to trial. For purposes of the present motion, the Court need only find that there are disputed facts regarding Nurse Bayer's conduct and motivations which preclude summary judgment on Gasca's Unruh Act claim even if intentional discrimination is a required element.

The motion for summary judgment is DENIED as to Claim 3 to the extent the claim is based on Nurse Bayer's conduct.

## IV. ORDER

CFMG's motion for summary judgment is

(1) GRANTED IN PART as to Claim 3, to the extent it is based on the pink cup;

(2) DENIED IN PART as to Claim 3, to the extent it is based on Nurse Bayer's conduct; and

(3) GRANTED as to Claim 5.

Dated: May 16, 2019

BETH LABSON FREEMAN
United States District Judge

12